UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DIANE MARTIN,

                         Plaintiff,                      **<u>MEMORANDUM & ORDER</u>**

           -against-                        CV 06-2049 (WDW)

STATE UNIVERSITY OF NEW YORK, STATE
UNIVERSITY OF NEW YORK COLLEGE AT
FARMINGDALE, LONG ISLAND EDUCATIONAL
OPPORTUNITY CENTER, DR. JONATHAN
GIBRALTER, in his individual and official capacity,
Dean VERONICA HENRY, in her individual and
official capacity, and Prof. ROBERT REGANSE, in
his individual and official capacity,

                         Defendants.
------------------------------------------------------------------X
RITA HEGDE,

                         Plaintiff,                      CV 06-5856

           -against-

STATE UNIVERSITY OF NEW YORK, STATE
UNIVERSITY OF NEW YORK COLLEGE AT
FARMINGDALE, LONG ISLAND EDUCATIONAL
OPPORTUNITY CENTER, DR. JONATHAN
GIBRALTER, in his individual and official capacity,
Dean VERONICA HENRY, in her individual and
official capacity, and Prof. ROBERT REGANSE, in
his individual and official capacity,

                         Defendants.
------------------------------------------------------------------X

**APPEARANCES:**
Law Offices of Frederick K. Brewington
50 Clinton Street, Suite 501
Hempstead, New York  11550
Frederick K. Brewington, Esq., Attorney for Plaintiffs

Andrew M. Cuomo, Attorney General of the State of New York
300 Motor Parkway - Suite 205
Hauppauge, New York 11788
Anne C. Leahey, Esq., Attorney for Defendants

**WALL, Magistrate Judge:**

Before this court, on consent of the parties, is a motion for summary judgment by

defendants State University of New York ("SUNY"), State University of New York College at

Farmingdale ("SUNY Farmingdale")[1], Long Island Educational Opportunity Center ("LIEOC"),

Veronica Henry, Jonathan Gibralter, and Robert Reganse. Plaintiffs Rita Hegde and Diane

Martin have opposed the motion.[2] For the reasons set forth herein, defendants' motion for

summary judgment is denied as to Martin's Title VII retaliation claims pertaining to her non-

renewal as associate dean and her transfer to a different site, and denied as to Hegde's Title VII

retaliation claims pertaining to her demotion from assistant dean, failure to promote her to

associate professor, and failure to award adequate discretionary salary increase for 2002-2003.

Defendants' motion is granted as to all other claims.

## BACKGROUND

The material facts, drawn from the Complaints and the parties' Rule 56.1 Statements, are

undisputed unless otherwise noted.

Defendant LIEOC is one of several educational opportunity centers established

throughout New York State for the purpose of providing educational and vocational services to

---

[1] Although formally known as Farmingdale State College, the university will be referred to as
SUNY Farmingdale throughout this decision.

[2] Martin and Hegde each filed a complaint in the Eastern District of New York on May 6, 2006
and October 30, 2006, respectively. Plaintiffs' cases were consolidated on March 6, 2008 by
order of Judge Feuerstein.

disadvantaged individuals. It has facilities in Brentwood, Hempstead, and on the grounds of SUNY Farmingdale, a campus of the State University of New York ("SUNY"). Defendants' Rule 56.1 Statement ("Def. Stmt") ¶¶ 1-2, DE [34-1]. SUNY Farmingdale maintains a supervisory relationship over the LIEOC. Gibralter Dep. 38:12-39:5.

Defendant Jonathan Gibralter served as President of SUNY Farmingdale from June 2001 through August 2006. Defendant Veronica Henry ("Henry"), who describes herself as an African American woman of Jamaican national origin, became dean of the LIEOC in 1998. At all times relevant to this action, Dr. Henry reported to the president, Gibralter.

Defendant Robert Reganse is an associate professor at the LIEOC who works in the college preparation department teaching both basic and high school equivalency mathematics. Reganse has worked at SUNY Farmingdale for more than 33 years. For roughly 28 years, he has been a member of his union at the university, held the position of vice president of academics, and acted as a key figure in labor management meetings. Def. Stmt ¶ 18; Plaintiffs' Rule 56.1 Counter Statement ("Pl. Stmt") ¶ 18, DE [34-11]. Based on the nature of their arguments, plaintiffs apparently surmise that Reganse used whatever influence he possessed by virtue of his union position to influence others to take allegedly discriminatory actions against the plaintiffs.

Plaintiff Rita Hegde ("Hegde"), a woman of East Indian origin, has been employed by the LIEOC since 1987, when she worked as an adjunct teacher in the English as a Second Language ("ESL") Program. Pl. Stmt ¶ 3. She began working full-time as an instructor at the LIEOC in 1990, teaching ESL, and later worked as an assistant dean from September 2000 through June 2002, when she returned to teaching full-time. Def. Stmt ¶ 3.

Plaintiff Diane Martin ("Martin") is an African-American woman who served a term

3

appointment as associate dean at the LIEOC from August 16, 2001 to December 15, 2002. During her time as associate dean, the three assistant deans at LIEOC, including plaintiff Rita Hegde, reported directly to her.  Martin, in turn, reported to defendant Veronica Henry.

### *Plaintiff Hegde's Hiring as Assistant Dean*

In the summer of 2000, Hegde, along with other LIEOC faculty, received a memorandum from Henry stating that she was seeking applicants for 10-month and 12-month positions as assistant deans at the LIEOC.  Def. Stmt ¶ 218; Pl. Stmt ¶ 218.  Hegde, not interested in the positions, chose not to apply.  Hegde Dep. 108:24-109:1.  However, after Reganse recommended Hegde for the position of assistant dean,[3] Henry telephoned Hegde at home and asked her to apply.  Henry told Hegde she was the best person for the job and offered her the job.  Hegde accepted the offer and began serving as an assistant dean on September 1, 2000.

### *Martin's Hiring as Associate Dean*

In the Spring of 2001, Henry drafted an advertisement and convened a search committee to fill the position of associate dean at the LIEOC.   The search committee conducted interviews and recommended three applicants to Henry for a second interview.  Of those three, Martin was the only African-American.  Henry interviewed all three and selected Martin as her first choice. Def. Stmt ¶ 230.[4]  She recommended to Gibralter that Martin be hired, and Gibralter approved Henry's recommendation without interviewing Martin himself.   SUNY Farmingdale extended

---

[3]   Def. Stmt ¶ 220.  As plaintiffs fail to cite evidence controverting defendants' statement, this fact is deemed to be admitted for purposes of this motion.  *See* Local Civil Rule 56.1.

[4]  According to Martin, Henry selected her "with great reluctance because she was an African-American."  However, the professed basis for her knowledge is the hearsay statements of Cheryl Canton, the LIEOC Director of Student Affairs.  The court will not consider this in determining the motion.

Martin an offer of employment as associate dean by letter dated August 2, 2001.  Martin's

appointment was classified as "Appendix A," and was subject to the laws of New York State and

the Policies of the Board of Trustees.  According to Martin, she maintained an office on the

Farmingdale campus until the end of August 2002.  Martin Aff. ¶ 69.

### Budget Cuts Mandated

In March of 2002, Vijay Macwan, a Vice-Chancellor at SUNY who was responsible for

the EOC programs for the entire state, told Henry she had to cut money out of the LIEOC budget.

In total, Henry was responsible for implementing cuts of approximately 5%, over $300,000, of

the LIEOC budget.[5]  Defendants have provided few specifics as to the budget process, offering

only Henry's testimony that her "principle" in implementing the cuts was to eliminate

administrative positions first and preserve teaching positions to the extent possible.  Def. Stmt ¶

82.  Martin counters that this principle is "mere pretext" and was never relayed to her despite her

status as Chief Academic Officer of the LIEOC.  Pl. Stmt ¶ 82.

### Hegde's Encounter with Reganse

On March 20, 2002, Henry brought Gibralter to visit the Brentwood unit of the LIEOC.

As assistant dean at Brentwood, Hegde took Gibralter on a tour of the facility's labs and

classrooms. Later that day, Hegde traveled to the Farmingdale campus to discuss Gibralter's

impression of the Brentwood operation with assistant dean Abraham Sabbas.  She located him in

the office of Professor Robert Reganse.  Upon seeing her, Reganse said to Hegde, "Oh, so tell me

what did the president think of the Indian woman running the unit?"  Hegde testified that she

found the remark offensive.

---

[5] Def. Stmt ¶ 21.  As plaintiffs fail to cite evidence controverting defendants' statement, this fact
is deemed to be admitted for purposes of this motion.  *See* Local Civil Rule 56.1.

According to Hegde, this was not the first time Professor Reganse had made comments that she found offensive or embarrassing. Hegde Aff. ¶ 46-50. Hegde avers that, in the Spring of 2000, "in the course of some conversation with me about his knowledge of Hindi words," Reganse used the words "madrchod" ("mother-fucker"), "behnchod" ("sister-fucker"), "lund" ("penis"), "chute" ("vagina"), "gandu" ("homosexual"), "lundvash" ("the person who does it to the homosexual"), "rundi" ("prostitute") and "pokachokedu" ("stud"). *Id*. at ¶ 46. Reganse admits to having this conversation, but states that it was in the context of telling her about an "extremely embarrassing situation" in which he related his knowledge of Hindi obscenities to a gentleman who turned out to be a priest. Reganse Dep. at 70:6-8; 71-72:19-12.

Around the same time in the Spring of 2000, Reganse allegedly asked Hegde "How come Indian women have voluptuous breasts?" and "when are you going to introduce me to an Indian woman with big breasts?" Hegde Aff. ¶ 47. Reganse did not recall ever saying that. Reganse Dep. at 76:7-10. On another occasion, Hegde avers that Reganse told her about an Indian friend of his who kept a dirty apartment with mouse droppings in it. Hegde Aff. ¶ 50. Reganse acknowledges sharing this information with Hegde. Reganse Dep. at 67-68:20-3.

Hegde never made any formal complaint about any of the incidents that occurred prior to the March 20, 2002 comment. She testified at her deposition that she told assistant dean Donna Scarella about Reganse's earlier remarks from the Spring of 2000 on April 26, 2002. Hegde stated that Scarella was the first person she told. Hegde Dep. 156:18-158:4.

Hegde brought up Reganse's "Indian woman in charge" remark in a telephone conversation with Dr. Henry on April 3, 2002. Henry responded by recommending that Hegde ask Reganse why he made the remark. Hegde felt "hurt and discouraged" by Henry's suggestion

and apparently did not speak to Reganse about his remark.  Pl. Stmt¶ 58.

### *Martin Becomes Involved in Hegde's Complaint regarding Reganse*

On or about April 24, Hegde told Martin about Reganse's March 20 comment at a meeting of the assistant deans.  After learning what Reganse said, Martin immediately called Gibralter's office to schedule a meeting.   Martin testified that she later found out that Reganse had made other comments to Hegde that she had found offensive.  Martin Dep. 216:2-4.

Martin met with Gibralter in his office on April 29 and told him about Reganse's remark regarding an Indian woman running the Brentwood unit.  Gibralter responded by telling Martin that if Hegde felt she was being discriminated against, Hegde should file a complaint with the Office of Administrative Action and Diversity.

Martin claims that on April 26, prior to her meeting with Gibralter, she informed Henry that Hegde was still upset about the remark Reganse had made regarding her being in charge of Brentwood.  Martin Aff. ¶ 16.  Defendants assert that this conversation occurred "on or about May 1, 2002."  Def. Stmt ¶ 57**.**  Henry testified that she had not heard from Hegde since she had spoken to her on April 3, and responded to the news from Martin by making an appointment to see Hegde as soon as she returned to her office.  Def. Stmt ¶ 58-59.

The parties have differing versions of the sequence of the next few events.  According to plaintiffs, Martin informed Henry that Hegde was still upset about the remark Reganse had made regarding her being in charge of Brentwood on April 26, prior to her meeting with Gibralter.  Martin Aff. ¶ 16.  After that meeting, Martin says she asked Henry to join her for lunch on April 30th.  During that lunch, she told Henry that she had reported Reganse's remarks to Gibralter and had asked for his advice as to how to handle the matter.  Martin states that Henry responded very

angrily to the news that Martin had gone to Gibralter and accused her of going to him to discuss her career and employment status. Martin Aff. ¶ 22-23. Martin testified that Henry remained upset even after Martin assured her that she had gone to Gibralter to discuss Hegde, and not herself. Martin Dep. 236:3-237:8. Plaintiffs contend that it was only after this lunch and after she learned that Martin had already gone to Gibralter with her complaint that Henry scheduled a meeting with Hegde for May 2nd.

Defendants' version of these events differs somewhat. They claim that the conversation between Martin and Henry about Hegde still being upset occurred "on or about May 1, 2002." Def. Stmt ¶ 57. Henry testified that she had not heard from Hegde since she had spoken to her on April 3, and that she responded to the news from Martin by making an appointment to see Hegde as soon as she returned to her office. Def. Stmt ¶ 58-59. As to the lunch with Martin, Henry testified that she recalled going to lunch with Martin, but that neither Hegde, nor Martin's meeting with Gibralter, was discussed. Indeed, Henry maintains that, at that time, she had no idea that Martin had met with Gibralter. Henry Dep. 129:20-131:3.

The parties agree that a meeting was held on May 2, 2002. Pl. Stmt ¶ 59. Prior to that meeting, Henry told Reganse that Hegde was very upset about the remark he had made to Hegde. Def. Stmt ¶ 60. When Hegde arrived at Henry's office on May 2nd, she asked that Martin participate in the meeting. Present at the meeting were Martin, Reganse, Henry, and Hegde. Reganse began the meeting by saying, "I don't want to mince words, waste time. I apologize." Hedge does not dispute that Reganse made this statement, but felt that his apology was not sincere. Hegde Dep. at 164. Henry then said, since Reganse had apologized, "[L]et's move on." Hegde replied that, "It is too little, too late. Dr. Henry, this is the straw that broke the camel's

back." According to Hegde, she then attempted to tell Henry about prior remarks Reganse made, but Henry said "I don't want to hear any of that; if you go to the court I would become an unwilling witness." Hegde Aff. ¶ 80.[6]  It is undisputed that Henry told Hegde that she had the right to file a complaint with the affirmative action office.

Hegde went to see SUNY Farmingdale's Interim Affirmative Action Officer Patricia Hill-Williams on May 6, 2002.  Hegde told Hill-Williams that Reganse had said to her, "So tell me, what did the president think of this Indian woman running the unit?"  Def. Stmt ¶ 72-75.  Hegde also testified that she told Hill-Williams about the lewd Hindi words used by Reganse in the Spring of 2000.  Pl. Stmt ¶ 75.  Hill-Williams told Hegde what her rights were, and gave her a complaint form to fill out.  Hegde did not send the completed complaint form to affirmative action until October 8, 2002.  While Hegde does not dispute that she waited until October to file her formal complaint, her responsive Rule 56.1 statement says only that she "felt overwhelming discouragement to bring the complaint as Ms. Hill-Williams appeared to be protecting Henry." Pl. Stmt ¶ 81.

### *Martin's Non-Renewal as Associate Dean*

Events regarding Martin's continued employment with the LIEOC were occurring during the same time period as the meetings regarding Hegde's complaints of discrimination.  Martin does not dispute that she was the last administrator hired by the LIEOC and that her position was non-essential.  In mid-April, Henry informed Martin that the State budget would be "the determinative factor" with respect to her continued employment.  Def. Stmt ¶ 25; Pl. Stmt ¶ 25.  Dr. Henry offered Martin a part-time teaching position to be funded with external money such as

---

[6]  Henry testified that Hegde had told everyone at the meeting that she had consulted a lawyer.

grants. Although Henry claims that Martin responded by telling her that she would never teach at LIEOC, Def. Stmt ¶ 29, Martin denies ever making such a statement. Pl. Stmt ¶ 29. To the contrary, Martin testified that on or about April 15th, Henry extended her an offer to continue serving as "Associate Dean of Academic Support Services," and that this offer was taken "off the table" after Martin attempted to confirm the offer in an e-mail to Henry on April 16th. Martin Dep. 160:23-24.

On May 3, 2002, the day after the meeting between Henry, Hegde, Martin, and Reganse regarding Hegde's complaints, Henry sent Martin a Term Appointment Notice indicating that she would be reappointed for four months instead of the "customary" year. Martin Aff. ¶51. Martin alleges that Henry's decision to not renew her appointment was in retaliation for Martin's efforts in opposing discrimination. *Id.* ¶ 56. Moreover, Martin claims that defendants were obligated to provide notice of non-renewal no later than March 31, 2002, and that the four month appointment was their attempt to "cure" the breach. *Id.* ¶¶ 48, 54.

Henry ultimately recommended to Gibralter that Martin not be re-appointed as associate dean.[7] According to Gibralter, the only reason Henry provided for Martin's non-renewal was the budget. Def. Stmt ¶ 89. Martin does not dispute what Gibralter was told, but strongly disputes Henry's "budgetary reason" as "purely pretextual." Pl. Stmt ¶ 89. Gibralter had the final decision as to whether or not Martin should be renewed, and on May 17, 2002, he sent Martin a

---

[7] While Henry never provides a precise date for this action, Martin's deposition testimony supports the conclusion that it occurred in early May. Martin testified that she was copied on an e-mail dated May 3rd from Gibraltar to Henry which stated that Gibraltar had not yet received Martin's renewal documentation. Given that Martin was notified on May 17 that she would be kept on for an additional four months and then released, it stands to reason that Henry made her recommendation during that intervening period.

non-renewal letter.  The letter informed Martin that her term appointment was being extended until December 15, 2002, at which point she would not be renewed.

As to Reganse's involvement in Martin's non-renewal, Henry claims that she never discussed her decision not to renew Martin with Reganse.  Def. Stmt ¶ 93.  Martin does not provide evidence to specifically contradict this statement, but generally argues that "at one point during my time at LIEOC, it was brought to my attention that [Henry] said if anybody is having problems with Dr. Martin, let her know, document it."  Martin Dep. 131-32:20-8.  The parties agree that Henry and Gibralter never asked Reganse for input about Martin's job performance.  Def. Stmt ¶ 94.  Nor do plaintiffs dispute defendants' contention that Reganse never spoke with Gibralter about Martin's involvement in Hegde's complaint.  Def. Stmt ¶ 96.

### *Hegde Demotion from Assistant Dean*

On May 30, 2002, Henry told Hegde that due to budgetary constraints, one of the three assistant dean positions at the LIEOC was going to be eliminated.  Both Hegde and assistant dean Abraham Sabbas came from the LIEOC's ESL department.  Each of these assistant deans also served as teachers, and each was removed from the classroom for twelve hours per week in order to fulfill his or her responsibilities as assistant dean.  Def. Stmt ¶ 98-100.  According to Henry, when she realized in February 2002 that the budget cut-backs would prevent her from hiring more ESL teachers, she told Hegde and Sabbas that one of the two would have to return to the classroom to teach.  Henry Aff. ¶ 57.  Henry avers that, "[a]bout two months later," Sabbas told her that he would continue as assistant dean.  *Id*. at ¶ 58.  Henry testified that, in contrast, Hegde never voiced a desire to remain in the deanship.  Def. Stmt ¶ 101-103.  Hegde denies that any such conversation with Henry ever took place, asserts that she learned an assistant dean position

was being eliminated for budgetary reasons for the first time on May 30, 2002, and contends that she was never given an option to remain in the deanship. Pl. Stmt ¶ 101. After Hegde ceased serving as an assistant dean, she returned to full-time teaching.

### *Martin's Transfer to the Brentwood Unit*

Notwithstanding the reason for Hegde's demotion, the parties agree that her departure from the deanship created a coverage problem at the Brentwood site. Def. Stmt ¶ 117; Pl. Stmt 117. In mid-June of 2002, Henry informed Martin that someone, perhaps Martin herself, was going to have to be moved to the LIEOC's Brentwood site. According to Henry, it was Martin's responsibility to provide coverage if the assistant deans were unavailable. Def. Stmt ¶ 118. Martin disagrees, arguing instead that her transfer was retaliatory. She avers that she was never told she would be responsible for filling gaps in coverage and points out that oversight of a facility, here the Brentwood campus building, was not included in the brief description of duties listed in the advertisement for the LIEOC associate dean position. Pl. Stmt ¶ 118. Moreover, a transfer to Brentwood would entail a significantly longer commute. Martin Compl. ¶ 41.

Despite Martin's protests, Henry subsequently assigned her to oversee the LIEOC Brentwood facility during the last four months of her employment. Though Henry claims that Martin maintained her office at the Farmingdale campus while overseeing Brentwood, Def. Stmt ¶ 122, Martin contends that she moved all her personal effects out of the Farmingdale office shortly after being transferred, and did not work out of Farmingdale after August 30, 2002. Pl. Stmt ¶ 122.

### *Hegde's Non-Promotion During the 2001-2002 Cycle*

Hegde applied for promotion to associate professor during the 2001-2002 promotions

cycle. Defendants assert that the criteria governing Hegde's promotion application were the same criteria which applied throughout Farmingdale State College. Def. Stmt ¶ 126. According to Henry, the LIEOC faculty had unanimously voted, in or about 1997, to be bound by college-wide promotions criteria. Def. Stmt ¶ 127. During the 2001-2002 promotion cycle, the college-wide criteria changed, placing more emphasis on scholarship than in previous years. Def. Stmt ¶ 128. Hegde disagrees that she was bound by college-wide criteria, and contends that SUNY Farmingdale's bylaws mandate that the LIEOC candidates be judged differently. Pl. Stmt ¶ 126.

Hegde was the only faculty member from the LIEOC who applied for promotion to associate professor during the 2001-2002 promotion cycle. The LIEOC promotions committee recommended Hedge for promotion and forwarded its recommendation to the college-wide promotions committee. Def. Stmt ¶ 136.[8] The parties disagree about how the college-wide promotions committee evaluated candidates for promotion. According to defendants, the college-wide committee applied current college-wide criteria to applicants for promotion, and created a list giving point scores to applicants. Def. Stmt ¶ 136. Hegde claims that the university's practice was to evaluate LIEOC candidates differently. Hegde Aff. ¶ 116. She also claims that application of the point system was arbitrary. Pl. Stmt ¶139.

Upon completion of the evaluation, the college-wide promotions committee generated a numeric score for each candidate. *See* Henry Aff., Ex. E. The college-wide promotions committee awarded Hegde a numerical score of 72.9, the sixth highest score of the nine candidates for promotion to associate professor. Def. Stmt ¶¶ 138, 139. These scores are

---

[8]According to Henry, neither she, Gibralter, nor Reganse had a seat on the college-wide promotions committee. Def. Stmt ¶ 137.

reflected in a document that lists the candidates alphabetically, not in "rank" order by score. According to Henry, this document was published to the faculty and president.  Def. Stmt ¶ 140. Hegde contends  that no document containing the scores was ever published to the faculty.  Pl. Stmt ¶ 140.

The college-wide promotions committee also generated a second document setting forth its priority recommendations for promotion. Brewington Decl., Ex. JJ. On this document, LIEOC candidates were listed separately and Hegde was the only, and hence the top, LIEOC candidate for promotion to associate professor.[9]  There does not appear to be any dispute that Gibralter received this document from the college-wide committee.

Henry also avers that, around the time this list was published, the President and Provost informed the deans that there would be only four promotions to associate professor.[10]  The Deans' Council met to discuss the list produced by the college-wide promotions committee. During her deposition, Henry testified that she could not recall whether she was present at that meeting.  Henry Dep. at 61:6-25.[11]  On August 9, 2002, the Deans' Council recommended to

---

[9]The parties agree that Hegde was not entitled to a promotion during the 2001-2002 promotions cycle by virtue of being the only person recommended for promotion to associate professor by the LIEOC promotions committee.  It is also undisputed that, as a general matter, there is no guarantee that someone ranked number one by the LIEOC promotions committee will receive a promotion.  Def. Stmt ¶ 156-57.

[10]  Def. Stmt ¶141.  As plaintiffs fail to cite evidence controverting defendants' statement, this fact is deemed to be admitted for purposes of this motion.  *See* Local Civil Rule 56.1.

[11]  Despite this earlier testimony, in her sworn affidavit submitted in support of the instant motion, Henry now claims that she not only participated in the meeting of the deans, but advocated for Hegde's promotion.  Henry Aff. ¶ 143-44.   She also claims that the other deans found Hegde's accomplishments merited a promotion.  *Id.* ¶ 147.  Henry offers no explanation for this change in recall, but just as a party cannot create an issue of fact by submitting an affidavit which contradicts her previous deposition testimony, *see Bickerstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir. 1999), a party cannot remove an issue of fact through the same mechanism.  As such, this portion of Henry's affidavit will not be considered by the court.

Gibralter the four individuals for associate professor from the list generated by the college-wide promotions committee, in fact the four individuals with the highest scores. *See* Henry Aff., Ex. F. Hegde was not among them. The Deans' Council ranked the four individuals it was recommending for promotion to associate professor in the exact order these individuals were ranked by the college-wide promotions committee.

After the Deans' Council made its recommendations to Gibralter, Henry told Gibralter that she could not recommend Hegde for promotion to associate professor because Hegde did not meet college-wide criteria for scholarship. Def. Stmt ¶ 151. Hegde claims that her supposed lack of scholarship was a pretext. Pl. Stmt ¶ 151. Gibralter concurred with Henry's belief that Hegde's scholarship was dated or weak, and in August 2002, he sent Hegde a letter stating that her promotion had not been recommended to him.

During the 2002-2003 promotions cycle, Hegde's application for promotion to associate professor was not forwarded to the college-wide promotions committee. Plaintiff was ultimately promoted to associate professor on September 1, 2004. Hegde claims that she received the promotion "despite little change in my scholarly ability from the previous promotion cycle." Hegde Aff. ¶115.

### *Plaintiffs' Internal Grievance Complaints*

On October 8, 2002, Hegde and Martin, along with several other LIEOC employees, filed a joint grievance with the college affirmative action office. Both Martin and Hegde requested hearings before a Tripartite Committee, a committee of faculty and staff that is trained by the affirmative action officer. The committee conducts informal hearings of complaints that come in through the affirmative action office, and makes recommendations to the President. The

President, in turn, makes the final decision.

Martin alleged to the Tripartite Committee that she was retaliated against after speaking with President Gibralter about discrimination against another employee. On January 21, 2003, the committee concluded there was evidence that Martin had been retaliated against following her meeting with Gibralter, and that such evidence possibly included her non-renewal. By letter dated January 27, 2003, Gibralter wrote to Martin, conveying the conclusion of the Tripartite Committee and telling her that, in spite of that conclusion, he was dismissing her charge based upon a lack of evidence that unlawful discrimination had occurred.

Hegde alleged to the Tripartite Committee that she did not receive a promotion to the rank of associate professor because of discrimination and retaliation. On January 21, 2003, the committee unanimously found that Hegde had been discriminated against, and that scholarship had been used as a "wedge to falsely justify" the denial of Hegde's promotion. Def. Stmt ¶ 182; Pl. Stmt ¶182. Gibralter met with Henry to discuss the conclusion of the committee. He also discussed the committee's findings regarding Hegde with the Provost, Dr. Frank Pellegrini, who had direct responsibility for overseeing the faculty at the university. According to Gibralter, he and Pelligrini agreed that Hegde's accomplishments since her last promotion were not sufficient to warrant promotion.[12] By letter dated January 27, 2003, Gibralter wrote to Hegde conveying the conclusion of the Tripartite Committee and his disagreement with the committee's findings.

### *Procedural History*

On March 5, 2003, Hegde filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR"), and cross-filed with the Equal Employment

---

[12] Def. Stmt ¶ 186. As plaintiffs fail to cite evidence controverting defendants' statement, this fact is deemed to be admitted for purposes of this motion. *See* Local Civil Rule 56.1.

Opportunity Commission ("EEOC").  Hegde Am. Compl. ¶ 8.  The complaint alleged

discrimination based upon the remark allegedly made to her by Reganse on March 20, 2002, and

retaliation based upon her having reported the alleged discriminatory remark to Martin.  Def.

Stmt ¶ 194.   Specifically, the NYSDHR complaint alleged that as a result of Hegde's opposition

to discriminatory behavior, she was forced to resign as an assistant dean and denied promotion to

associate professor.  Def. Stmt ¶ 195.  The EEOC subsequently issued a Right to Sue letter on

August 9, 2006.  Hegde Am. Compl. ¶ 11.

On March 13, 2003, Martin filed a charge of discrimination with the NYSDHR and cross

filed with the EEOC.  Her complaint alleged discrimination on the basis of race and retaliation.

The EEOC issued Martin a Right to Sue letter on February 1, 2006.  Martin Compl. ¶¶ 8-9, 11.

### *Plaintiffs' Claims*

Plaintiffs each assert multiple claims for discrimination and retaliation under Title VI and

Title VII of the 1964 Civil Rights Act.  Specifically, Hegde alleges that, because of her national

origin: (1) she was denied promotions in 1994, 1999, and 2002; (2) she was denied proper

discretionary salary increases from 2000 to 2005; (3) she was subjected to harassment by

defendant Reganse;[13] and (4) was demoted from her position as assistant dean.  Alternatively,

Hegde alleges that she was demoted and denied promotion in 2002 in retaliation for complaining

about allegedly discriminatory remarks made by defendant Reganse.

Martin alleges that because of her race: (1) she was transferred from the LIEOC's

Farmingdale facility to its Brentwood facility; and (2) she was not renewed as associate dean.

Alternatively, Martin alleges that these acts were done in retaliation for making discrimination

---

[13]  Though not clearly stated as such in her complaint, the parties have treated this claim as one
for "hostile work environment" under Title VII.

complaints on Hegde's behalf.

In addition, both Hegde and Martin assert claims for breach of contract under New York State law. Plaintiffs each claim that defendants violated their respective employment contracts by engaging in discriminatory practices. Secondly, Martin alleges that defendants breached a provision of the collective bargaining agreement by failing to give her timely notice of her non-renewal.

## DISCUSSION

### *Standard of Review*

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed.R.Civ.P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a summary judgment motion, the district court must resolve all reasonable ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Pub'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996). The applicable substantive law determines which facts are critical and which are irrelevant. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point

to issue-finding; it does not extend to issue resolution.'" *B.F. Goodrich v. Betoski*, 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish*, 85 F. Supp. 2d at 180 (quoting *Celotex*, 477 U.S. at 322).

District courts are cautious about granting summary judgment when intent is at issue since "a victim of discrimination . . . is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Even in the discrimination context, however, a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

## I. Title VII Claims

Hegde and Martin claim that the adverse employment actions taken against them violated Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. Title VII provides, in pertinent part, that an employer is prohibited from discharging or otherwise discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of that individual's race or national origin. *See* 42 U.S.C. § 2000e-2(a). In addition to prohibiting various forms of intentional discrimination, the statute also makes it unlawful to retaliate against an employee because she has engaged in activity protected under the statute, including the making of informal complaints to management

regarding discriminatory treatment. *See* 42 U.S.C. § 2000e-3(a); *see also Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).[14]

## A. Procedural Issues

At the outset, defendants move for summary judgment on the majority of Hegde's Title VII claims on procedural grounds. Specifically, they contend that a number of Hegde's claims are barred due to her failure to exhaust administrative remedies as well as her failure to timely file her EEOC charge.

### 1. Exhaustion

As a precondition to bringing suit under Title VII in federal court, a plaintiff is ordinarily required to exhaust her administrative remedies, beginning with the filing of a timely claim with the EEOC or an appropriate State or local agency.[15] *See Fitzgerald v. Henderson*, 251 F.3d 345, 358-59 (2d Cir. 2001). This exhaustion of administrative remedies is an integral part of Title VII's remedial scheme, and one with which defendants are entitled to insist plaintiffs comply. *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000) (internal citation omitted). In a subsequent court action, a plaintiff may pursue only those claims which were either expressly asserted in her EEOC charge or are "reasonably related to" the allegations contained therein.

---

[14] The anti-retaliation provision of Title VII also protects employees who have "participated in any manner in an investigation, proceeding, or hearing under this subchapter." Neither Martin nor defendants have addressed whether Martin's conduct falls under this participation clause as opposed to Title VII's opposition clause. The court does note, however, that the Second Circuit's expansive view of the participation clause strongly suggests that Martin's conduct falls within the ambit of Title VII's participation clause. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 174-75 (2d Cir. 2005).

[15] Because the NYSDHR and EEOC operate under a work-sharing agreement, Hegde's NYSDHR charge is deemed to have been concurrently filed with the EEOC. *See* 29 C.F.R. 1626.10(c).

*Fitzgerald,* 251 F.3d at 345. Here, it is undisputed that the following claims were not included in

Hegde's EEOC charge: (1) failure to promote in 1994 and 1999; (2) the denial of tenure in 1996;

and (3) "under-recognition" in discretionary salary increases ("DSI") from 2000 to 2005. Hegde

has made no attempt to argue that the failures to promote and denial of tenure claims reasonably

relate to the claims in the EEOC charge. Accordingly, those claims are barred. Hegde does

contend, however, that the DSI claims that accrued between 2002 and 2005, subsequent to her

complaints about Reganse, reasonably relate to the allegations in her charge.

A claim is "reasonably related" where "the conduct complained of would fall within the

'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of

discrimination,'" or where the claim "alleges further incidents of discrimination carried out in

precisely the same manner alleged in the EEOC charge." *Butts v. City of New York Dep't of*

*Hous. Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993) (superseded by statute on other

grounds)). Applying this standard, the court finds that Hegde's claim of inadequate DSI for the

2002-2003 academic year is reasonably related to the express allegations in her charge. The

record indicates that the increase was awarded in or about October of 2002,[16] subsequent to the

alleged discrimination and several months before Hegde filed her complaint with the EEOC. Pl.

Ex. BB. In addition, Dr. Henry testified that the reason she awarded Hegde a $500 increase,

rather than a $1,500 increase, was because Hegde was not serving as Assistant Dean at that time.

Henry Dep. 216. It is therefore reasonable to expect that the issue would have fallen within the

scope of the EEOC's investigation into the circumstances surrounding Hegde's demotion from

her Assistant Dean position. *See Carmellino v. Dist. 20 of New York City Dep't of Educ.*, 2004

---

[16] Based on the facts in the record, it appears that DSI are granted in the Fall of the academic
year to which they apply.

WL 736988, at *17 (S.D.N.Y. Apr. 6, 2004) (plaintiff's termination claim was reasonably related where it accrued subsequent to conduct complained of, and prior to EEOC filing).

In contrast, Hegde's DSI claims for the 2003-04 and 2004-05 academic years, which have virtually no foundation in the record, are not "reasonably related" to the allegations in her EEOC charge. These claims are too remote in time to have fallen within the scope of the EEOC investigation. Furthermore, since Hegde's initial filing with the EEOC made no mention whatsoever of any discriminatory failure to award DSIs, the new claims cannot be interpreted as alleging further incidents of discrimination carried out in "precisely the same manner" alleged in the charge. Finally, while claims "alleging retaliation by an employer against an employee for filing an EEOC charge" are considered reasonably related, *see Butts,* 990 F.3d at 1403, Hegde has not alleged that she was retaliated against for filing her administrative complaint in March of 2003.

Hegde has failed to exhaust her administrative remedies as to her Title VII claims arising from denials of promotion in 1994 and 1999, a denial of tenure in 1996, and inadequate discretionary salary awards in all years other than 2002-2003. Accordingly, defendants' motion for summary judgment as to those claims is granted.

### 2. *Timeliness*

Under Title VII, a New York plaintiff must file an EEOC charge within 300 days of the discriminatory conduct. *See Kantor-Hopkins v. Cyberzone Health Club*, 2007 WL 2687665, at *5 (E.D.N.Y. Sept. 10, 2007); *see also* 42 U.S.C. §2000e-5(e). This deadline functions like a statute of limitations. *Kantor-Hopkins,* 2007 WL 2687665, at *5 (citing *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003)). Here, because Hegde did not file

her complaint with the EEOC until March 5, 2003, defendants submit that her Title VII claims stemming from events occurring prior to May 2, 2002 must be dismissed as time-barred. Defendants argue this includes Hegde's hostile work environment claim, since Reganse's most recent remark was made on March 20, 2002.[17] Hegde argues this claim is rendered timely pursuant to the continuing violation doctrine or, alternatively, by equitable tolling. Hegde is wrong.

As a threshold matter, the court is satisfied that based on the evidence of Reganse's conduct, which consisted of a handful of verbal exchanges on three or four occasions over the course of approximately two years, no reasonable jury could find an actionable hostile work environment under Title VII. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity . . . there must be a steady barrage of opprobrious racial comments." *Id.* (citations omitted). Reganse's remarks, however tasteless, fall far short of that standard. Even if the evidence did support such a finding, however, Hegde's reliance on the continuing violation doctrine would still be misplaced.

Under the continuing violation exception, a claim for hostile work environment will only be timely where at least one act contributing to the claim occurred within the statutory period. *Sundaram v. Brookhaven Nat'l Lab.*, 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006) (citing *Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004)). Here, the undisputed facts in the record clearly establish that there was no contributory act that was itself timely. The most

[17] As the majority of the stale claims are dismissed on exhaustion grounds for reasons discussed *supra*, this court need only address the late filing's impact on Hegde's cause of action arising from the comments of Reganse. Though plaintiff does not expressly refer to a "hostile work environment," the parties' arguments do address such a claim.

recent, Reganse's March 20, 2002 "Indian woman in charge" remark, was made more than 13 months prior to the EEOC filing, and regardless of Hegde's personal dissatisfaction with Reganse's apology given on May 2, 2002, or her desire for more punitive action taken by Dean Henry, the quality of the institutional defendants' response to her complaint about Reganse cannot be considered a "contributory act" for the purpose of extending her time to file with the EEOC. *See Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 489-90 (S.D.N.Y. 2000); *see also Wahlstrom v. Metro-North Commuter R.R.*, 89 F. Supp. 2d 506, 526 ("[N]othing gives [the plaintiff] the right to choose the penalty for her harasser."). Nor can Hegde use her subsequent termination as Assistant Dean and denial of promotion in order to revive her harassment claim. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("discrete acts which fall within the time period do not make timely acts that fall outside the time period"). As no contributory act occurred within the statutory period, Hegde may not apply the continuing violation doctrine to revive her claims.

The facts of this case also render equitable tolling inappropriate. Equitable tolling requires a showing that (1) the plaintiff has acted with reasonable diligence during the period she seeks to have tolled, and (2) that circumstances are so extraordinary that the doctrine should apply. *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002). Here, while there is no question that Hegde actively pursued relief through SUNY Farmingdale's grievance process from October 8, 2002 through March 3, 2003, it is her lack of diligence prior to that time that fatally undermines her request for equitable tolling. Despite having received a complaint form during her May 6 meeting with the college's affirmative action officer, Hegde opted to wait more than five months to initiate a grievance. Def. Stmt ¶¶ 73, 80.

When asked at her deposition why she had refrained from filing for so long, Hegde testified that she felt Williams was protecting Reganse, and that she "just didn't want to look at [those] people." Hegde Dep. 169:10-11. Plaintiff has not expressly argued that her uneasiness excuses the delay. Even crediting her discomfort, Hegde's alleged concerns regarding the impartiality of the campus grievance process do not explain her failure to promptly file a complaint with an external body such as the EEOC or NYSDHR. Moreover, Hegde has not identified any extraordinary circumstances warranting the application of equitable tolling.

Accordingly, defendants' motion for summary judgment on Hegde's Title VII claims arising prior to May 2, 2002 is granted.[18] Hegde's remaining claims are her discrimination and retaliation claims pertaining to the 2002 failure to promote, her demotion from assistant dean, and inadequate DSI in the 2002-2003 school year.

## B. Substantive Issues

Defendants move for summary judgment on plaintiffs' remaining Title VII discrimination and retaliation claims on substantive grounds, arguing that plaintiffs have failed to make out a prima facie case under either theory. Alternatively, defendants contend that neither Hegde nor Martin has shown that defendants' reasons for taking the actions in question were pretextual.

### 1. Discrimination Claims

Plaintiffs' discrimination claims are analyzed under the three-step burden shifting framework first enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804

---

[18] Of course, the statute of limitations is not a rule of evidence, and this finding by no means precludes Hegde from using Reganse's March 20 remark as relevant background information for her remaining claims. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102 (2002); *see also Fitzgerald*, 251 F.3d at 365 ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period.").

(1973).  Under this approach, each plaintiff must first establish a prima facie case of discrimination based on, in this case, national origin or race; if she does so, the employer bears the burden of articulating a legitimate, nondiscriminatory reason for its actions; if the employer does so, the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action.  *See Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  At all times, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54, (1981).

To establish a prima facie case of discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.  *Id*.  The plaintiffs' burden at this threshold step is minimal.  *Id*.  In this case, there is no dispute that both Hegde and Martin satisfy the first three elements of a prima facie case.  Defendants insist, however, that neither has produced sufficient evidence to raise issues of material fact establishing that their respective adverse employment actions occurred under circumstances giving rise to an inference of discrimination.  The court agrees.

### a. Hegde's Prima Facie Case

Defendants posit that Hegde's national origin discrimination claims must fail because the only evidence that could potentially give rise to an inference of discrimination is "a stray remark from a non-decision maker."  Def. Mem. at 7.  While this is somewhat of an oversimplification, they are essentially correct.

There is no question that Reganse's comments serve as the lynchpin of Hegde's discrimination claims. His words, however, do not demonstrate that there was a discriminatory motive behind the adverse employment actions she endured. Verbal comments may constitute direct evidence of discrimination when made by a decision-maker in the adverse employment action, and where there is a close nexus between the comments and the action. *Rose v. N.Y. City Bd. Of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001). However, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007). Additionally, "remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by discriminatory sentiment expressed in the remark." *Id*. Here, the record clearly indicates that it was Henry and Gibralter, not Reganse, who were the ultimate decision-makers with respect to Hegde's demotion from the position as Assistant Dean and her non-promotion to associate professor.

Though Reganse's alleged bias could be imputed to Henry and Gibralter's decisions by showing that he had substantial input or influence in the decision-making processes leading to her termination and non-promotion, *see, e.g., Weber v. Parfums Givenchy, Inc.*, 49 F. Supp. 2d 343 (S.D.N.Y. 1999), Hegde has done nothing more than provide general statements regarding Reganse's "decision-making responsibilities." Pl. Mem. at 13. For instance, as evidence of Reganse's influence, Hegde points to his status as Vice President of Academics in SUNY Farmingdale's union, his role in disputes regarding violations of the collective bargaining agreement, and his position on the LIEOC promotions committee. *Id*. None of these roles

27

necessarily placed Reganse in a position to influence Henry's decision to demote Hegde from the deanship. In addition, it is undisputed that Reganse recommended Hegde for promotion during the 2001-2002 cycle. Hegde Dep. 137:6. Consequently, while his seat on the LIEOC's promotions committee unquestionably placed Reganse in a position to influence the decision-making process, there is no evidence whatsoever that he exercised that influence to Hegde's detriment. Indeed, the committee upon which Reganse sat, the LIEOC promotions committee, recommended Hegde for promotion and forwarded her name to the college-wide promotions committee. It was the college-wide promotions committee that did not recommend her, and there is no evidence that Reganse was a member of, or had any influence on, the decision making of that committee. Accordingly, there is no evidence upon which a rational trier of fact could find that Reganse impeded Hegde's chances for advancement.

Without an evidentiary link between Reganse and the adverse employment actions, Hegde's discrimination claims disintegrate. The record is utterly devoid of any evidence of discriminatory animus on the part of Henry and Gibralter. In fact, Hegde testified at her deposition that Henry "never gave [her] any reason to believe" that she was prejudiced against those of Indian national origin. Hegde Dep. at 190. Her discrimination claims are also badly weakened in light of Henry's instrumental role in hiring plaintiff as an assistant dean in 2000, convincing her to take the job even after Hegde had declined to apply. Def. Stmt ¶¶ 219; 221-23. When the same actor hires a person known to be in a protected class and later takes adverse employment action, "it is difficult to impute to [the actor] an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). The inference against discrimination is "especially" strong where the adverse action

occurs within a short time after hiring.  *Id.*; *see also Carlon v. Mystic Transp., Inc.*, 202 F.3d 129, 137-38 (collecting cases).  In light of these facts, the notion that Henry subsequently developed prejudice against Hegde based on her Indian national origin, less than two years after hiring her, is simply not credible.

Hegde has failed to establish that her demotion and defendants' failure to promote her occurred under circumstances giving rise to an inference of discrimination.  Accordingly, defendants' motion for summary judgment on Hegde's Title VII claims alleging discrimination based on national origin is granted.

### b.  *Martin's Prima Facie Case*

Martin offers two theories to support her contention that her non-renewal and transfer were race-based, neither of which is persuasive.  First, Martin asserts that Dean Henry, who is herself African-American, intentionally disfavored African-American employees in order to curry favor with Caucasians.  Second, Martin posits that Reganse compelled Henry to take action against Martin.

Though Martin correctly points out that "[t]he proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable," *Danzer v. Norden Sys. Inc.*, 151 F.3d 50, 55 (2d Cir. 1998), no reasonable jury could find that Henry so discriminated based on the instant facts.  For instance, Martin alleges that Henry displayed racial animus on multiple occasions, yet her allegations are supported by nothing other than her own subjective perception of events.  When asked at her deposition if and when Henry had manifested racial animus, Martin could only refer to an occasion where she saw Henry acting rudely towards a pair of African-American janitors who were accruing overtime, and to various other points

29

when she felt Henry "[paid] deference to a Caucasian faculty member [as opposed to Martin] when it was totally inappropriate." Martin Dep. 177-178. Neither situation objectively evinces discriminatory animus. Although Martin references on-campus grievances of a number of African-American LIEOC employees, she fails to provide any specifics or any evidence regarding those grievances, such as affidavits from the other employees.

Next, Martin seeks to indirectly prove that Henry had a discriminatory state of mind by pointing out that she chose to renew two white employees, and not "cut" two others, around the same time that Martin and several other African Americans were let go. Pl. Mem. at 20. This too is unavailing. While a plaintiff can raise an inference of discrimination by showing that an employer treated her less favorably than an employee outside her protected group, the employee with whom she seeks to compare herself must be similarly situated in all material respects. *See Syrkin v. State Univ. of New York*, 2008 WL 4179690, at *6 (E.D.N.Y. Sept. 10, 2008) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)); *see also Lizardo v. Denny's Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (to be "similarly situated in all material respects," the individuals' circumstances "need not be identical, but there should be a reasonably close resemblance of facts and circumstances"). Here, there were marked differences between Martin's job responsibilities and those of the Caucasian employees she identifies who were not cut. For instance, none of the other employees held positions as administrators–Michael Oil was a faculty member and a professor in the ESL Department, and Charles Miranda was an employment coordinator. Henry Aff. ¶ 27. Angela Luchetti and Lynn Sheer held "lower level administrative positions." Martin Aff. ¶ 37. In light of these differences, no reasonable jury could find that the renewed employees were "similarly situated."

Like Hegde, Martin also seeks to characterize Reganse as "the man behind the curtain," yet she has put forth no evidence suggesting he had input in the relevant decision-making processes. When asked at her deposition whether she ever learned that Reganse had persuaded Dr. Henry to transfer her to Brentwood, Martin responded that she'd merely "theorized" that he was involved. Martin Dep. 142:11-19. Even assuming, *arguendo*, that he was involved, the evidence that Reganse was prejudiced against African-Americans is dubious, at best. For example, Martin states that soon after she began at the LIEOC, Reganse told her, "you need to get into the classroom to get a sense of what this population is about so you understand the nature of this population." Martin Dep. 136:14-20. Since the LIEOC's student body is largely comprised of minorities, she considered his words to be indicative of a discriminatory attitude. *Id*. at 137-8:23-5. On its face, this comment is not racial – Reganse could just as easily have been referring to the fact that LIEOC students were predominately underprivileged economically or in need of certain academic support. Next, Martin avers that, from her observations, Reganse resented her because she was an African-American in a position of authority. Martin Aff. ¶ 89. Yet, the only apparent basis for this belief is that Martin is African-American, and she had a contentious relationship with Reganse. One does not necessarily follow from the other.

In sum, Martin's race-based discrimination claims fare no better than Hegde's. "[A] jury cannot infer discrimination from thin air." *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998). Here, a jury would have to do exactly that to find in Martin's favor. Accordingly, the defendants' motion for summary judgment dismissing Martin's Title VII claims alleging discrimination on the basis of race is granted.

## 2. Retaliation Claims

Title VII retaliation claims are analyzed under the same *McDonnell Douglas* burden-shifting framework employed in claims of discrimination. *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). To establish a prima facie case of retaliation under Title VII, "a plaintiff is required to show: '[1] that she engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against [her], and [4] that a causal connection exists between the protected activity and the adverse action, *i.e.,* that a retaliatory motive played a part in the adverse employment action.'" *Marshall v. NYC Bd of Elections*, 322 Fed.Appx. 17, 19 (2d Cir. 2009) (quoting *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir.2001) (internal quotations omitted)). As with discrimination claims, "[i]f the plaintiff makes the prima facie showing, the burden shifts to the defendant to articulate legitimate, nondiscriminatory reasons for their actions." *Terry*, 336 F.3d at 141. If the defendant does so, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reasons are simply a pretext for retaliation. *Johnson v. County of Nassau*, 480 F. Supp. 2d 581, 600 (E.D.N.Y. 2007) (citation omitted).

Defendants submit that plaintiffs' retaliation claims should be dismissed because neither has adduced sufficient evidence to establish the first and fourth elements of the prima facie case. Even if they have, defendants argue, summary judgment is warranted because no rational jury could find that defendants' legitimate, nondiscriminatory reasons were pretextual.

### a. Protected Activity

In the context of a Title VII retaliation claim, "'[p]rotected activity' includes opposition to a discriminatory employment practice or participation in any investigation, proceeding, or

hearing under Title VII." *Hubbard v. Total Comm., Inc.,* 347 Fed.Appx. 679, 680-81 (2d Cir. 2009); *see also Martinez v. New York City Dept. of Educ.,* 2008 WL 2220638, at *11 (S.D.N.Y. May 27, 2008); 42 U.S.C. §2000e-3(a). It is clearly established that "informal complaints to supervisors constitute protected activity under Title VII." *Sclafani v. PC Richard & Son,* 668 F. Supp. 2d 423, 437 (E.D.N.Y. 2009); *see generally Amin v. Akzo Nobel Chemicals, Inc.,* 282 Fed.Appx. 958, 961 (2d Cir. 2008); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir. 2000); *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

To satisfy the "protected activity" element of the prima facie case, a plaintiff need not establish that the underlying conduct was in fact a violation of Title VII, but rather need only show that she had a "good faith, reasonable belief" that the conduct was unlawful. *See, e.g., Amin,* 282 Fed. Appx. at 961; *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir. 1986). Whether that belief was "objectively reasonable," and not merely subjective, is determined based on the facts and the record presented. *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 279 (S.D.N.Y. 2002); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (per curiam). Thus, although the court has determined, *supra,* that Reganse's conduct did not constitute a violation of Title VII, the question on the retaliation claim is whether either plaintiff possessed a good faith, reasonable belief that it did.

### i. Hegde

Although Hegde did not file any formal complaint until October 2002, after most of the allegedly retaliatory conduct had occurred, it is clear that she participated in several earlier conversations in which she voiced her complaints. The nature of her complaints was that

Reganse's offensive remarks targeted her on the basis of her national origin. Hegde complained to both Henry and Martin separately, she participated in the May 2nd meeting with Henry, Martin and Reganse to discuss her complaints, and she met with SUNY Farmingdale's affirmative action officer. Even without the filing of a grievance, these informal complaints are sufficient to establish that Hegde engaged in protected activity.

Defendants argue that neither plaintiff could reasonably believe that Reganse's "Indian woman running the unit" remark constituted a violation of Title VII. *See* Def. Mem. at 17-18. Hegde need only show that she had a good faith, reasonable belief that she was being discriminated against. Viewing the facts in the light most favorable to plaintiff Hegde, Reganse's remark could be interpreted as a direct insult which, in light of his past comments, could have led Hegde to reasonably conclude that she was the victim of unlawful harassment. *See Reed*, 95 F.3d at 1179 (jury's finding that plaintiff's complaint constituted protected activity was not unreasonable where evidence presented to jury consisted of two objectionable comments from co-workers). On the record before it, the court finds that a jury could find that Hegde possessed a reasonable, good faith belief that Reganse's conduct violated Title VII.

### ii. Martin

Martin's argument is more tenuous. At the outset, neither party has addressed the question of whether Martin's "complaints" regarding alleged discriminatory conduct taken against a third party, Hegde, constitute protected activity. As explained recently by one court, "there is a distinction between an employee's reporting of egregious conduct directed at her . . . and an employee's reporting of egregious conduct directed at another." *Ezuma v. City Univ. of New York*, 665 F. Supp. 2d 116, 122-23 (E.D.N.Y. 2009). For instance, a supervisor's "mere

passing on" of a complainant's statements "is not inherently 'oppositional' in the same way as the victim's own report of that misconduct." *Id*. at 123-24. Conversely, a supervisor who acts as an advocate for the alleged victim may be said to have engaged in opposition under Title VII. *Id*. Here, Hegde complained to Martin, who in turn met with Gibraltar and Henry to discuss the incident. Based on these facts, the court is satisfied that a rational jury could find that Martin was not merely passing along Hegde's complaints, but was advocating on her behalf.

Her advocacy aside, Martin's professed belief that Reganse's conduct violated Title VII must still have been reasonable. Defendants do not specifically attack the reasonableness of Martin's belief, but rather argue that "plaintiffs" could not have reasonably believed that Reganse's remark violated Title VII. At her deposition, Martin testified that while Hegde told her about the March 20 exchange with Reganse at a meeting with the assistant deans, she was not informed that he'd made previous remarks to Hegde until sometime afterward. Martin Dep. at 216:2-4. In fact, she could not recall whether she was aware of Reganse's prior comments at the time she met with President Gibralter. *Id.* at 217:2-4. However, it appears Martin may have been led to believe Hegde's reaction to the singular remark was especially severe, as she apparently believed that Hegde broke down in tears in Reganse's presence. *See id.* at 214:5. As such, based on the information she possessed at the time, a rational jury could conclude that Martin reasonably believed that Hegde had been unlawfully harassed.

### b. Causation

Causation can be established either "indirectly, by showing that the protected activity was followed closely by discriminatory treatment," or "directly, through evidence of retaliatory animus directed by the defendant against the plaintiff." *Gordon v. New York City Bd. of Educ.*,

232 F.3d 111, 117 (2d Cir. 2000) (citing *Cosgrove v. Robinson*, 9 F.3d 1033, 1039 (2d Cir.

1993)); *see also DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987).

"Title VII is violated if a retaliatory motive played a part in an adverse employment action even if

it was not the sole cause. *Davis*, 802 F.2d at 642. Furthermore, if an employer is motivated by

retaliatory animus, Title VII is violated even if there are objectively valid grounds for the action.

*DeCintio*, 821 F.2d at 115.

### i. Hegde

As defendants point out, the only evidence of causation offered by Hegde is the timing of

the adverse actions themselves. This is not necessarily insufficient, as the Supreme Court has

recognized that causality may be inferred through timing alone where the temporal proximity

between an employer's learning of protected activity and the adverse employment action

following thereafter are "very close." *See Clark County Sch. Dist.*, 532 U.S. at 273.

Hegde's demotion claim clearly meets this standard. Martin informed Dean Henry of

Hegde's continued complaints on April 26 and, on May 30, just over one month later, Hery told

Hegde she would no longer be serving as an Assistant Dean at the LIEOC. The gap is even

smaller if Hegde's May 6 appointment with Ms. Hill-Williams, of which Henry testified she was

aware, is taken into account. Either way, the pertinent events were easily close enough for a

rationale trier of fact to infer a causal connection. *See, e.g., Triglia v. Town of Manlius*, 313 F.3d

713, 721 (2d Cir. 2002) (one month sufficient to establish causal link); *McGrory v. City of New

York*, 2004 WL 2290898, at *7 (S.D.N.Y.) (one or two months sufficient for causation).

Hegde's failure to promote claim presents a more difficult question. While there is no

bright line as to when a temporal link becomes too tenuous to infer a causal relationship, district

courts in this Circuit have generally found that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." *O'Neal v. State Univ. of New York*, 2006 WL 3246935, at *15 (E.D.N.Y. Nov. 8, 2006) (quoting *Cunningham v. Consol. Edison, Inc.*, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (collecting cases)); *see also Miller v. Batesville Casket Co.*, 2007 WL 2120371, at *12 (E.D.N.Y. July 23, 2007) ("[C]ourts have determined that adverse employment actions taken one and one-half months after the protected activity is sufficient, while more remote actions are not.") (citations omitted). Here, the facts in the record indicate that Gibralter made the decision not to promote Hegde to associate professor sometime in mid-August, over three months after her last complaint.

Nevertheless, given the facts of this case, the court is satisfied that the three-month interval is not too temporally remote for a reasonable jury to infer causation. Due to the timing of the annual cycle for faculty promotions, Henry's non-recommendation in August represented her very first opportunity to weigh in on Hegde's application for promotion. Moreover, recent decisions in this Circuit demonstrate that a three month interval does not necessarily vitiate a causal link. *See Levitant v. City of New York Human Res. Admin.*, 625 F. Supp. 2d 85, 108-109 (E.D.N.Y. 2008) (finding that three and four month gaps did not necessarily preclude jury finding of causation); *see also Hubbard v. Total Comm., Inc.*, 347 Fed. Appx. 679, 681 (2d Cir. 2009) (holding that four month period between protected activity and employee's termination did not present "the outer limit" of temporal proximity and jury was entitled to find there was a causal connection).

### ii. Martin

Martin has also adduced sufficient evidence to establish a causal link, through timing

alone, between her complaints regarding Reganse's comment to Hegde and her subsequent transfer to the Brentwood campus. Specifically, plaintiff testified that Henry first raised the possibility that Martin might be transferred to Brentwood in late June, less than two months after she first brought Hegde's continued dissatisfaction to Henry's attention, and even less time after Martin allegedly told Henry of her meeting with President Gibralter regarding the same subject. Martin Dep. 205:6-18.

Martin's non-renewal claim is different. In the instant case, it is undisputed that Martin was specifically informed in mid-April, long before she engaged in any possible protected activity, that she might not be renewed because of budgetary constraints. Martin Dep. 244. As such, she cannot establish causation solely through temporal proximity. *See Clark County Sch. Dist.,* 532 U.S. at 273 ("Employers need not suspend previously planned [employment actions] upon discovering that [an employee has engaged in protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality.").

Unlike Hegde, however, Martin has put forth additional evidence from which a rational jury could infer causation. Martin testified that Henry became "very angry" upon learning that plaintiff had met with President Gibralter. Martin Dep. at 236. This alleged display of retaliatory animus by the very individual who made the decision not to renew the plaintiff is enough to satisfy the causation requirement at the prima facie stage.[19] Indeed, since Henry's alleged reaction preceded both Martin's non-renewal and her transfer to Brentwood, this testimony alone is sufficient proof from which to infer a causal link between Martin's protected

---

[19]Of course it is for the jury to decide whether Henry's alleged anger was founded on the fact that Martin went over her head to complain to Gibralter, or on Martin's reporting of possible discrimination.

activity and both adverse employment actions. Although Henry testified that she could not recall discussing any meeting between Martin and Gibralter, her awareness of such a meeting as well as her response upon learning of it remain material issues of fact for a jury.

### c. *Legitimate Reasons and Pretext*

As plaintiffs have each made out prima facie cases of retaliation as to their respective claims, defendants have the burden of articulating, through the introduction of admissible evidence, non-retaliatory reasons for their actions. Once an employer has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff has the burden of showing that the stated reason was pretextual, and that the employer was motivated at least in part by an unlawful desire to retaliate against the plaintiff. A plaintiff may show pretext by demonstrating that the employer's proffered legitimate reasons for its actions are unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. *See Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005).

### i. *Hegde's Demotion from Assistant Dean*

Henry has articulated that the decision to end Hegde's time as Assistant Dean was made in response to budgetary constraints and a shortage of full-time faculty in the ESL department. Henry Dep. at 120. Both Hegde and Abraham Sabbas were members of the ESL department, and while they could teach 16 hours as full time faculty, they could only teach four while serving concurrently as assistant deans. *Id.* at 121. After deciding that one of them would have to go back to teaching full-time, Henry stated that she asked both Hegde and Sabbas to come to a decision as to who would like to continue as Assistant Dean. *Id.* at 120. According to Henry, Sabbas volunteered to continue about two months later, while Hedge remained silent. *Id.* at

122.;  Henry Aff. ¶ 58.

Hegde flatly denies that Henry ever gave her an option to continue as Assistant Dean.

Hegde Aff. ¶ 135.  This contradictory testimony, combined with the closeness in time between

her demotion and her complaints about Reganse, could lead a reasonable jury to conclude that

Henry's stated reasons were a pretext for retaliation.  *See St. Mary's Honor Ctr. v. Hicks*, 509

U.S. 502, 511 (1993) (holding that rejection of the defendant's proffered allows the trier of fact

to infer the ultimate fact of unlawful intent).  Accordingly, the defendants' motion for summary

judgment on Hegde's Title VII claim alleging retaliatory termination of her position as Assistant

Dean is denied.

### ii.  Denial of Hegde's Application for Promotion to Associate Professor

Defendants claim that Hegde was denied promotion to associate professor because she

did not meet the college-wide criteria for scholarship.  Henry Aff. ¶ 62.  Hegde offers two

arguments to demonstrate this reason is a pretext.  First, she counters that defendants improperly

judged her according to criteria used throughout SUNY Farmingdale, as opposed to a separate

standard for LIEOC applicants.  Second, even if the application of college-wide criteria was

proper,  Hegde argues she was still "more than qualified for the position of Associate Professor."

Def. Stmt ¶ 156; Pl. Mem. at 30.

Hegde's first argument is wholly unsupported by the evidence before the court.  While the

Second Circuit has recognized that departures from procedural regularity can serve as evidence

of pretext, *see Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 453 (2d Cir. 1999), Hegde has offered

no evidence to demonstrate that defendants departed from procedure in this case.   Plaintiff has

provided  no evidence to dispute Henry's statement that, in or about 1997, the LIEOC faculty

unanimously agreed to be bound by college-wide criteria for promotions. Def. Stmt ¶ 127; Pl. Stmt ¶ 127. Nor has plaintiff bothered to explain what alternative criteria ought to have been applied in lieu of the college-wide criteria during the 2001-2002 cycle. In effect, plaintiff's only tangible support of her argument is the separate listing of LIEOC candidates on the college-wide committee's list of recommendations to the President. *See* SUNY Farmingdale Bylaws of the Faculty: Article 10.14.3, Pl. Ex. V.; Pl. Ex. JJ.[20] This is simply not enough. Hegde concedes that, despite being listed separately, top-ranked LIEOC candidates are not guaranteed promotion. Def. Stmt ¶ 156. If LIEOC candidates were judged by their own distinct standards when being considered for promotions, logic would compel the opposite conclusion, namely that the top-ranked LIEOC would be promoted.

It is Hegde's second argument, that she deserved promotion even under college-wide criteria, that spares her claim from summary judgment. To be sure, it is not the court's role to second-guess defendants' judgment that Hegde's scholarship was too "dated" or "weak" to warrant promotion, so long as that belief was genuine. *See Bickerstaff*, 196 F.3d at 455 ("[A college] alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them."); *see also LaBella v. New York City Admin. for Children's Serv.*, 2005 WL 2077192, at * 18 (E.D.N.Y. Mar. 28, 2005) ("Even if [the employer's] decision to terminate plaintiff was informed by erroneous facts or mistaken beliefs, it was nevertheless based on non-discriminatory reasons."). Here, however, Hegde's claim appears to rest entirely on the credibility of defendant Henry. In light of the aforementioned factual discrepancies

---

[20] Plaintiff also cites the opinion of the campus Tripartite Committee. The Committee's report, however, is hearsay and does not fall within the "public records and reports" exception of F.R.E. 803(8)(C). *See Lamphere v. Brown Univ.*, 685 F.2d 743, 749 (1st Cir. 1982) (opinions of university hearing panel composed of faculty not covered).

surrounding Hegde's demotion, as well as the marked differences in Henry's deposition testimony as compared to her affidavit in support of this motion regarding the deliberations of the Deans' Council and her initial support for Hegde's promotion, the court is convinced that this issue is best left to a jury. Accordingly, defendants' motion for summary judgment on Hegde's Title VII claim alleging retaliatory denial of promotion is denied.

### iii. Martin's Non-Renewal and Transfer

According to Henry, the decision not to renew Martin was made in response to the need to reduce the LIEOC's budget by approximately $300,000. Henry Aff. ¶ 21. In implementing the cuts, Henry determined that the LIEOC would be best served by cutting administrative positions first, while preserving teaching positions to the extent possible. *Id*. Martin was the last administrator hired at the LIEOC and her position was non-essential. *Id*. at ¶ 22. Henry avers that she decided to reassign Martin to supervise the Brentwood campus because of the coverage problem created by Hegde's return to full-time teaching. Hegde had always worked out of Brentwood and had served as the administrator there since the fall of 2000. According to Henry, Martin was responsible, as Associate Dean, for providing coverage in the event that one of the assistant deans was unavailable. *Id*. at ¶ 34.

Construing the record in the light most favorable to Martin, the court finds she has just barely met her evidentiary burden on the issue of pretext. Though defendants have made out a convincing case that objectively valid reasons existed for Martin's nonrenewal and transfer, Henry's alleged display of anger upon learning of Martin's meeting with Gibralter raises sufficient questions as to whether an unlawful retaliatory motive was a motivating factor in her decision. *See DeCintio,* 821 F.2d at 115 ("Even if there was no dispute as to the impropriety of

[plaintiff's] conduct, the evidence of retaliatory animus on [the employer's] part would suffice to defeat the summary judgment motion."). Accordingly, the defendants' motion for summary judgment on Martin's Title VII claim alleging retaliatory transfer is denied.

## II. Title VI Claims

Plaintiffs also allege that defendants' actions against them violated Title VI of the 1964 Civil Rights Act. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Defendants seek summary judgment on these claims based on a lack of standing, as well as the untimeliness of Hegde's claims.

### A. Standing

In order to recover for a violation of Title VI, a plaintiff must demonstrate that (1) the defendant received federal financial assistance, (2) the plaintiff was an intended beneficiary of the program or activity receiving the assistance, and (3) the defendant discriminated against the plaintiff on the basis of race, color, or national origin in connection with that program or activity. *Commodari v. Long Island Univ.*, 89 F. Supp. 2d 353, 378 (E.D.N.Y. 2000); *see also Scelsa v. City Univ. of N.Y.*, 806 F. Supp. 1126, 1140 (S.D.N.Y. 1992). As this is a case of employment discrimination, the federal funds received by defendants must have been aimed primarily at providing employment. *See Ass'n Against Discrimination In Employment ("AADE"), Inc. v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981); *see also* 42 U.S.C. § 2000d-3. Here, plaintiffs have failed to produce sufficient evidence for a rational trier of fact to conclude they were themselves intended beneficiaries of federal funds.

To support their claim of standing, plaintiffs first point to the LIEOC's annual receipt of federal Carl D. Perkins grants. According to Henry, however, the Perkins grants "[can] be used only for vocational programs that would benefit students." Henry Reply Aff. ¶ 11. As such, plaintiffs could not have been the intended beneficiaries. Martin counters that "upon information and belief, the federal grants received by the LIEOC contribute[s] to the salaries of employees at the LIEOC. The exact amount is unknown as the recipient of the funds has discretion as to its disbursement." *Id*. at ¶ 130. These allegations, admittedly made solely upon information and belief and without any supporting evidentiary facts, can play no role whatsoever in summary judgment proceedings where, as here, they are denied by the opposing party. *See Baker v. Latham Sparrowbrush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995).

Plaintiffs next cite a report found on the website for the Research Foundation of the State University of New York which purportedly shows that $852,000 of federal money went to salaries at SUNY Farmingdale. Pl. Ex. RR. This exhibit lacks evidentiary value for several reasons. First, and foremost, the report refers to the June 2006 – June 2007 fiscal year, as opposed to the relevant timeframe for this action. Secondly, even if this court were to ignore that fact, and clearly it cannot, it also bears mentioning that the particular chart cited by the plaintiffs does not show that federal money went to State employees generally. Rather, it indicates that funds distributed by the SUNY Research Foundation went to "salaries" associated with "sponsored programs" at SUNY Farmingdale. Yet, there is no information provided as to what these "sponsored programs" were. In short, the Research Foundation chart does not "readily reveal the primary purpose of federal funds" received by SUNY Farmingdale. *See AADE*, 647 F.2d at 265.

As plaintiffs have not established that they were beneficiaries of federal funds received by defendants, they cannot prevail under Title VI. Accordingly, defendants' motion for summary judgment on plaintiffs' Title VI claims is granted.

### B. Timeliness

Even if Hegde had standing to sue, her Title VI claims would still be barred by the statute of limitations. "Although Title VI does not contain an express statute of limitations, in New York, such claims falls within the three-year statute of limitations applicable to personal injury causes of action." *Al-Haideri v. Trustees of Columbia Univ.*, 2007 WL 2187102, at *2 (S.D.N.Y. 2007). Since Hegde commenced her action on October 30, 2006, Defendants contend that her Title VI claims accruing prior to October 30, 2003 are time-barred. This encompasses Hegde's claims concerning: (1) failures to promote in 1994, 1999 and 2002; (2) a denial of tenure in 1997; (3) her termination as Assistant Dean in 2002; (4) a hostile work environment in 2002; and (5) insufficient DSI awards prior to October 30, 2003. Hegde again invokes the continuing violation doctrine to argue these claims are timely.

At the outset, this court notes that none of the authority cited by Hegde pertains to use of the continuing violation doctrine in a Title VI case. As this court has previously stated, it is questionable whether the doctrine applies to claims brought under Title VI. *See Folkes v. New York Coll. of Osteopathic Med. of New York Inst. of Tech.*, 214 F. Supp. 2d 273 (E.D.N.Y. 2002).[21] Whereas Title VII acts as an outright prohibition applicable to all employers, aiming centrally to compensate victims of discrimination, Title VI conditions an offer of federal funding

---

[21] *Folkes* addressed the applicability of the continuing violation exception to a Title IX claim. However, its reasoning applies with equal force here since "Title VI is 'parallel to Title IX except that it permits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs.'" *Id*. at 292 (E.D.N.Y. 2002) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 289 (1998)).

on a promise by the recipient not to discriminate. *See id*. at 288 (internal citations omitted).

Title VI is therefore contractual in nature, and a drastic expansion of its limitations period might

exceed the goals of the statute. As in *Folkes*, however, it is readily apparent that the exception

does not apply under the instant facts.

With the exception of her claim for hostile work environment, all of the untimely claims

in Hegde's Amended Complaint refer to discrete employment actions. *See Morgan*, 536 U.S. at

114 (characterizing a failure to promote as a discrete act); *see Sundaram*, 424 F. Supp. 2d at 560

(claim of inadequate wages is a discrete act); *see also Padilla v. Potter,* 2004 WL 3090591, at *3

(E.D.N.Y. Jul. 22, 2004) (characterizing a claim of unequal pay as a "discrete, individual

wrong"). The Supreme Court has held that the continuing violation doctrine does not apply to

"discrete" employment actions. *Morgan* at 114. Rather, each alleged incident constitutes a

separate actionable adverse employment practice. *See id.*

Hegde's hostile work environment claim, though not a "discrete" employment action, is

also untimely under Title VI. As discussed *supra*, the last act which could be said to have

contributed to the alleged hostile work environment occurred on March 20, 2002 – more than 18

months beyond the reach of Title VI's three-year statute of limitations.

### III. *Claims Against the Individual Defendants*

Summary judgment is also sought with respect to plaintiffs' Title VI and Title VII claims

against defendants Reganse, Henry, and Gibralter on the grounds that individuals are not

amenable to suit under either statute. While plaintiffs do not oppose dismissal of the Title VI

claims, they maintain that Title VII allows for individuals to be sued in their official capacities.

While it is well-settled that individuals may not be held personally liable under Title VII,

*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995), the Second Circuit has yet to decide

whether the statute permits individuals to be sued in their official capacities. *See Cook v.*

*Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 n.2 (2d Cir. 1995). Nevertheless, given that

"there is no distinction made under Title VII for lawsuits brought against employers in their

official capacities, and lawsuits brought against employers in their individual capacities," *White*

*v. Home Depot Inc.*, 2008 WL 189865, at *4 (E.D.N.Y. Jan. 17, 2008), many recent decisions in

this Circuit have rejected Title VII official capacity claims as well. *Carmody v. Village of*

*Rockville Centre*, 2009 WL 3188394, at *23 (E.D.N.Y. Sept. 30, 2009) (collecting cases). The

court finds no reason to depart from established precedent in this District. Accordingly, the

defendants' motion for summary judgment on Plaintiffs' Title VI and Title VII claims is granted

as to the individual defendants Reganse, Henry, and Gibralter.

### IV. Breach of Contract Claims

#### A. Martin

Defendants contend they are entitled to summary judgment on Martin's breach of contract

claim because she is required to resort to the grievance format set forth in the collectively

bargained agreement between her union, the United University Professionals ("UUP"), and the

State University Professional Services Negotiating Unit ("PSNU"). This court agrees.

"In general, when a collective bargaining agreement provides for arbitration and

grievance procedures for employee grievances, the aggrieved employee must make an attempt to

exhaust the procedures set forth in the collective bargaining agreement prior to resorting to

judicial relief." *Tand v. Solomon Schecter Day Sch. of Nassau County*, 324 F. Supp. 2d 379, 384

(E.D.N.Y. 2004) (citing *Vaca v. Sipes*, 386 U.S. 171, 184 (1967)); *see also Ponticello v. County*

*of Suffolk*, 225 A.D.2d 751 (2d Dep't 1996) ("It is settled that when 'an employer and a union enter into a collective bargaining agreement that creates a grievance procedure, an employee subject to the agreement may not sue the employer directly for breach of that agreement but must proceed, through the union, in accordance with the contract'").  In the instant matter, the subject matter of Martin's contractual dispute falls squarely within the scope of the collective bargaining agreement negotiated between Martin's union, the UUP, and the PSNU.  *See* Article 7.2 ("[W]ith respect to matters regarding appointment, evaluation and promotion of employees a grievance shall be deemed to mean a claimed failure by the State to follow the procedural steps relating to appointment, evaluation and promotion of employees contained in the Policies of the Board of Trustees. . .").

As there is no evidence that Martin ever filed a grievance, she has failed to exhaust the procedures established by the collective bargaining agreement and thus may not assert a breach of contract claim in this court.  Accordingly, the defendants' motion for summary judgment on Martin's breach of contract claim is granted.

### B. Hegde

Despite having styled their motion as one for summary judgment on all plaintiffs' claims, defendants have not addressed Hegde's claim for breach of contract.  However, because Hegde has failed to state a valid cause of action, this court finds that claim must also be dismissed.

According to Hegde's Amended Complaint, the stated basis for this claim is defendants' failure to abide by the "terms and statements that were contained in Defendants' Employee Handbook," including "written assurances, representations, and promises [that the Defendants] would not unlawfully discriminate against Plaintiff, based on color or national origin, during the

course of her employment." Hegde Am. Compl. ¶ 59. This claim is fatally flawed in several respects. First, a plaintiff cannot turn a defendant's statutory obligation to act in accordance with federal, state, and local laws prohibiting discrimination into a contractual one as well. *Al-Haideri v. Trustees of Columbia Univ.*, 2007 WL 2187102, at *8 (S.D.N.Y. 2007). Second, and more substantively, "[r]outinely issued employee manuals, handbooks, and policy statements should not be lightly converted into binding employment agreements." *Lobosco v. New York Tel.*, 96 N.Y.2d 312, 317 (2001). This is especially true where the handbook contains an express disclaimer. *Id*.; *see also Baron v. Port Authority of N.Y. & N.J.*, 271 F.3d 81 (2d Cir. 2001). The handbook cited here contains such a disclaimer on its very first page. It provides that "[t]he Handbook is not intended to establish or modify policies of the College or the State University of New York Board of Trustees. It is neither an employment contract nor does it bestow any additional rights on faculty or professional staff regarding the terms and conditions of employment." Professional Handbook of SUNY Farmingdale, Pl. Ex. V. As such, Hegde could not have reasonably treated the assurances contained in the Handbook as legally enforceable contractual obligations. Thus the entry of summary judgment in favor of defendants on Hegde's claim for breach of contract is appropriate.

## CONCLUSION

In sum, defendants' motion for summary judgment is granted as to the following claims: (1) plaintiffs' Title VI and breach of contract claims; (2) plaintiffs' Title VII claims against the individual defendants; (3) plaintiffs' Title VII discrimination claims; (4) Hegde's Title VII claims arising from denials of promotion in 1994 and 1999, denial of tenure in 1996, and inadequate award of DSI in all years other than 2002-2003; and (5) Hegde's Title VII claims

49

arising prior to May 2, 2002 - including any claim for hostile work environment. Defendants'
motion is denied in all other respects, leaving the following claims for trial: (1) Martin's Title
VII retaliation claims pertaining to her transfer to Brentwood and non-renewal; and (2) Hegde's
Title VII retaliation claims pertaining to her demotion from assistant dean, the failure to promote
to associate professor, and the inadequate DSI claim for 2002-2003.

Dated: Central Islip, New York
     March 26, 2010

**SO ORDERED:**


 /s/William D. Wall
WILLIAM D. WALL
United States Magistrate Judge